AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
NOV 0 8 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

One (1) Samsung Cellular Telephone
Model: SM-J327T1
IMEI#: 352001/09/554969/9

Case No. **19MJ4994**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated herein by reference).

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated herein by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC§ 952, 960, and 963 | Importation of a Controlled Substance |

The application is based on these facts:

See attached affidavit of HSI Special Agent Jeffrey Rabine.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jeffrey Rabine, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/8/19

*Judge's signature*

City and state: San Diego, California

Hon. Allison H. Goddard, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Special Agent Jeffrey Rabine, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of applications for warrants to search the following electronic devices, as further described in Attachment A-1 (collectively referred to herein as the "**Target Device**"):

> Black Samsung SM-J327T1
>
> IMEI # 352001/09/554969/9
>
> Seized as FP&F No. 2020250400006201

("**Target Device**" as further described in Attachment A) and to seize evidence of crimes, specifically violations of Title 21, United States Code, Section(s) 952, 960 and 963, as further described in Attachment B.

2. The requested warrant relates to the investigation and prosecution of Christian GOMEZ Garcia ("GOMEZ") for importing approximately 36.44 kilograms (80.33 pounds) of methamphetamine from Mexico into the United States. The **Target Device** was seized from GOMEZ at the time of his arrest, has been securely stored since that time, and is currently in the evidence vault located at 880 Front Street, Suite 3200, San Diego, CA 92101.

3. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining search warrants for the **Target Device**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## BACKGROUND

4. I have been employed as a Special Agent with Homeland Security Investigations (HSI) since July 2017. I am currently assigned to the Contraband Smuggling Group 4 at San Ysidro, California. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.

5. During my tenure with HSI, I have participated in the investigation of various drug trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California.

6. Through my training, experience, and conversations with other members of law enforcement, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry. I am aware that it is common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones. Because they are mobile, the use of cellular telephones permits narcotics traffickers to easily carry out various tasks related to their trafficking activities, including, *e.g.*, remotely monitoring the progress of their contraband while it is in transit, providing instructions to drug couriers, warning accomplices about law enforcement activity, and communicating with co-conspirators who are transporting narcotics and/or proceeds from narcotics sales.

7. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in narcotics trafficking investigations, I am aware that individuals engaged in drug trafficking commonly store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in drug trafficking, as well as images and videos of drugs or contraband, proceeds and assets from drug trafficking, and communications to and from recruiters and organizers.

8. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

   a. tending to indicate efforts to import methamphetamine or some other federally controlled substance, from Mexico into the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of methamphetamine or some other federally controlled substance, from Mexico into the United States;

   c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substance, from Mexico into the United States;

   d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substance, from Mexico into the United States, such as stash houses, load houses, or delivery points;

   e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

9. On October 6, 2019, at approximately 2:30 p.m., GOMEZ attempted to enter the United States at the San Ysidro, California, Port of Entry. GOMEZ, a United States Citizen, was driver, sole occupant and registered owner of a red 2007 Chevy Silverado bearing Mexican plate #AK4778A. A Customs and Border Protection Officer (CBPO) was assigned to primary lane #11 and contacted GOMEZ. GOMEZ presented a B1/B2 border crossing card. GOMEZ stated he was going to San Ysidro to go shopping. A CBPO asked GOMEZ if he had anything to declare and GOMEZ stated he had nothing to declare. A CBPO conducted a computer query of both GOMEZ and the vehicle license plate and

3

received a computer-generated alert. A CBPO referred GOMEZ to the vehicle secondary lot for additional inspection. GOMEZ was arrested and the **Target Device** was seized from inside GOMEZ's vehicle.

10. A CBPO was assigned to conduct a further inspection of the vehicle. A CBPO removed seventy-six (76) packages containing a crystal-like substance located in the fuel tank. A CBPO tested a sample of the substances found using the Gemini testing device and the substance tested positive for the characteristics of methamphetamine. The methamphetamine had a total net weight of 36.44 kgs (80.33 pounds).

11. Later, another HSI agent and I read GOMEZ his *Miranda* rights, and he agreed to speak to agents without an attorney present. During a post-Miranda interview, GOMEZ said he was paid $500 to cross the border in his vehicle. GOMEZ said he was approached about eight months ago by a co-worker when he was a manager at the Roost & Co restaurant in Tijuana, Mexico. His co-worker named "Juan Carlos" mentioned to him how easy it is to smuggle drugs across the border, and the people he (Juan Carlos) knows pay well. GOMEZ said he brushed it off.

12. GOMEZ said about two months ago he found himself broke and needed money to feed his family and buy medications for his wife. GOMEZ said he contacted Juan Carlos and asked him to put him in contact with the people he knew so GOMEZ could make some money. An individual GOMEZ only knows as "CARLOS" called him and talked about smuggling. GOMEZ said he only spoke with CARLOS and never met him in person. Carlos is listed as "CARNAL" in his phone under number 686-160-6315.

13. CARLOS then introduced GOMEZ to an individual he only knows as "DAVID." GOMEZ said DAVID called and they met in person in about a day after talking to CARLOS. GOMEZ said that DAVID is listed as "Jefe" in his phone under number 664-484-5030. GOMEZ described DAVID as a Hispanic male, about 5'6" tall, medium build, short straight brown hair, sometimes with facial hair, and dresses casually. GOMEZ said DAVID drives an older grey 4-door Honda with US plates.

14. GOMEZ said he normally gets a call from CARLOS telling him to cross with

4

the vehicle. DAVID then calls and sets up a time to drop off the vehicle. GOMEZ explained that although the vehicle is registered in his name, it is not actually his. GOMEZ explained that DAVID keeps the truck and only gives it to him when they (CARLOS & DAVID) want him to cross the border with it. GOMEZ said he has crossed in the vehicle about fourteen times. GOMEZ said he was told to cross with the vehicle to create a record of him crossing in the vehicle. GOMEZ said he has crossed loaded with narcotics two prior times on the previous two Thursdays (October 3, 2019 & September 26, 2019). GOMEZ said he agreed to smuggle narcotics across the border for $500 each trip. GOMEZ said he has been paid about $1,000 so far and was going to be paid $500 after this trip. GOMEZ said once he crosses the border he is called by DAVID and directed where to take the vehicle. GOMEZ said when he gets to the location, he leaves the vehicle and gets the vehicle back when the drugs are off loaded. GOMEZ then takes the vehicle back to his house and calls DAVID. DAVID then shows up and pays GOMEZ in cash and takes the keys to the vehicle. GOMEZ said he was told the organization wanted his vehicle to be sent to secondary and inspected on one of the days it wasn't loaded so it created a record of the vehicle being clean.

15.  GOMEZ further stated he met with DAVID on the day of his arrest around 1100 hours. GOMEZ gave DAVID the keys to the truck and was given the truck and keys sometime after 1800 hours. GOMEZ was told to cross with the vehicle and call DAVID once he was clear of the border.

16.  In light of the above facts, GOMEZ's statements, and my own experience and training, there is probable cause to believe that GOMEZ was using the **Target Device** to communicate with others to further the importation of illicit narcotics into the United States.

17.  In my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of

5

the narcotics. Based on my training and experience, it is also not unusual for individuals, such as GOMEZ, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Device** for data beginning on September 7, 2019 through October 7, 2019, which was the day following Defendant's arrest.

## METHODOLOGY

18. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the devices may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

6

19. Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

20. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

21. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

## CONCLUSION

22. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Device** will yield evidence of GOMEZ's violations of Title 21, United States Code, Sections 952, 960 and 963.

23. Because the **Target Device** was seized at the time of GOMEZ's arrest and has been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Device**. As stated above, I believe that the appropriate date range for this search is from September 7, 2019 through October 7, 2019.

24. Accordingly, I request that the Court issue warrants authorizing law enforcement to search the items described in Attachment A and seize the items listed in Attachment B using the above-described methodology.

1  I swear the foregoing is true and correct to the best of my knowledge and belief.

                                                         /s/ Jeffrey Rabine
                                                   Special Agent Jeffrey Rabine
                                                   Homeland Security Investigations

Subscribed and sworn to before me this __8th__ day of November, 2019.

/s/ Allison H. Goddard
Hon. Allison H. Goddard
United States Magistrate Judge

8

## **ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following property is to be searched:

> Black Samsung SM-J327T1
>
> IMEI # 352001/09/554969/9
>
> Seized as FP&F No. 2020250400006201
>
> ("**Target Device**")

**Target Device** is currently in the possession of Homeland Security Investigations, 880 Front Street, Suite 3200, San Diego, CA 92101.

## **ATTACHMENT B**

### ITEMS TO BE SEIZED

Authorization to search the **Target Device** includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of September 7 1, 2019 through October 7, 2019:

a. tending to indicate efforts to import methamphetamine or some other federally controlled substance, from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of methamphetamine or some other federally controlled substance, from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substance, from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963.